NATIONAL ARCHIVES AND RECORDS ADMINIS-
TRATION *v.* FAVISH ET AL.

No. 02–954.   Argued December 3, 2003—Decided March 30, 2004

158

*Patricia A. Millett* argued the cause for petitioner. With her on the briefs were *Solicitor General Olson, Assistant Attorney General Keisler, Deputy Solicitor General Kneedler, Leonard Schaitman,* and *Robert M. Loeb. James Hamilton* argued the cause for Anthony et al., respondents under this Court's Rule 12.6 in support of petitioner. With him on the briefs was *Robert V. Zener.*

Respondent *Allan J. Favish* argued the cause and filed a brief *pro se.**

JUSTICE KENNEDY delivered the opinion of the Court.

This case requires us to interpret the Freedom of Information Act (FOIA), 5 U. S. C. § 552. FOIA does not apply if the requested data fall within one or more exemptions. Exemption 7(C) excuses from disclosure "records or information compiled for law enforcement purposes" if their production "could reasonably be expected to constitute an unwarranted invasion of personal privacy." § 552(b)(7)(C).

In *Department of Justice* v. *Reporters Comm. for Freedom of Press,* 489 U. S. 749 (1989), we considered the scope of Exemption 7(C) and held that release of the document at issue would be a prohibited invasion of the personal privacy of the person to whom the document referred. The principal document involved was the criminal record, or rap sheet, of the person who himself objected to the disclosure. Here, the information pertains to an official investigation into the circumstances surrounding an apparent suicide. The initial question is whether the exemption extends to the decedent's family when the family objects to the release of photographs showing the condition of the body at the scene of death. If we find the decedent's family does have a personal privacy interest recognized by the statute, we must then consider whether that privacy claim is outweighed by the public interest in disclosure.

I

Vincent Foster, Jr., deputy counsel to President Clinton, was found dead in Fort Marcy Park, located just outside

---

*Briefs of *amici curiae* urging affirmance were filed for the Reporters Committee for Freedom of the Press et al. by *Deanne E. Maynard, Elaine J. Goldenberg, Lucy A. Dalglish, Richard M. Schmidt, Jr., Bruce W. Sanford, David B. Smallman,* and *Alice Neff Lucan;* and for the Silha Center for the Study of Media Ethics and Law by *Jane E. Kirtley.*

*Karen B. Tripp* filed a brief for the Association of American Physicians & Surgeons, Inc., et al. as *amici curiae.*

Washington, D. C. The United States Park Police conducted the initial investigation and took color photographs of the death scene, including 10 pictures of Foster's body. The investigation concluded that Foster committed suicide by shooting himself with a revolver. Subsequent investigations by the Federal Bureau of Investigation, committees of the Senate and the House of Representatives, and independent counsels Robert Fiske and Kenneth Starr reached the same conclusion. Despite the unanimous finding of these five investigations, a citizen interested in the matter, Allan Favish, remained skeptical. Favish is now a respondent in this proceeding. In an earlier proceeding, Favish was the associate counsel for Accuracy in Media (AIM), which applied under FOIA for Foster's death-scene photographs. After the National Park Service, which then maintained custody of the pictures, resisted disclosure, Favish filed suit on behalf of AIM in the District Court for the District of Columbia to compel production. The District Court granted summary judgment against AIM. The Court of Appeals for the District of Columbia unanimously affirmed. *Accuracy in Media, Inc.* v. *National Park Serv.*, 194 F. 3d 120 (1999).

Still convinced that the Government's investigations were " 'grossly incomplete and untrustworthy,' " App. to Pet. for Cert. 57a, Favish filed the present FOIA request in his own name, seeking, among other things, 11 pictures, 1 showing Foster's eyeglasses and 10 depicting various parts of Foster's body. Like the National Park Service, the Office of Independent Counsel (OIC) refused the request under Exemption 7(C).

Again, Favish sued to compel production, this time in the United States District Court for the Central District of California. As a preliminary matter, the District Court held that the decision of the Court of Appeals for the District of Columbia did not have collateral estoppel effect on Favish's California lawsuit brought in his personal capacity. On the merits, the court granted partial summary judgment to OIC. With the exception of the picture showing Foster's eye-

glasses, the court upheld OIC's claim of exemption. Relying on the so-called *Vaughn* index provided by the Government—a narrative description of the withheld photos, see *Vaughn* v. *Rosen*, 484 F. 2d 820 (CADC 1973)—the court held, first, that Foster's surviving family members enjoy personal privacy interests that could be infringed by disclosure of the photographs. App. to Pet. for Cert. 56a. It then found, with respect to the asserted public interest, that "[Favish] has not sufficiently explained how disclosure of these photographs will advance his investigation into Foster's death." *Id.*, at 59a. Any purported public interest in disclosure, moreover, "is lessened because of the exhaustive investigation that has already occurred regarding Foster's death." *Id.*, at 58a. Balancing the competing interests, the court concluded that "the privacy interests of the Foster family members outweigh the public interest in disclosure." *Id.*, at 59a.

On the first appeal to the Court of Appeals for the Ninth Circuit, the majority reversed and remanded, over Judge Pregerson's dissent. 217 F. 3d 1168 (2000). In the majority's view, although evidence or knowledge of misfeasance by the investigative agency may "enhanc[e] the urgency of the [FOIA] request," "[n]othing in the statutory command conditions [disclosure] on the requesting party showing that he has knowledge of misfeasance by the agency." *Id.*, at 1172–1173. Furthermore, because "Favish, in fact, tenders evidence and argument which, if believed, would justify his doubts," the FOIA request "is in complete conformity with the statutory purpose that the public know what its government is up to." *Ibid.* This was so, the Court of Appeals held, even in the face of five previous investigations into Foster's death: "Nothing in the statutory command shields an agency from disclosing its records because other agencies have engaged in similar investigations. . . . [I]t is a feature of famous cases that they generate controversy, suspicion, and the desire to second guess the authorities." *Id.*, at 1173. As the majority read the statute, there is "a right to look, a

right to speculate and argue again, a right of public scrutiny." *Ibid.*

The Court of Appeals, however, agreed with the District Court that the exemption recognizes the Foster family members' right to personal privacy. Although the pictures contain no information about Foster's relatives, the statute's protection "extends to the memory of the deceased held by those tied closely to the deceased by blood or love." *Ibid.* Nevertheless, the majority held that the District Court erred in balancing the relevant interests based only on the *Vaughn* index. While "the [D]istrict [C]ourt has discretion to decide a FOIA case on the basis of affidavits, and affidavits are in some cases sufficient," "the agency affidavits are insufficiently detailed." 217 F. 3d, at 1174. It remanded the case to the District Court to examine the photos *in camera* and, "consistent with [the Court of Appeals'] opinion," "balance the effect of their release on the privacy of the Foster family against the public benefit to be obtained by their release." *Ibid.*

On remand, the District Court ordered release of the following five photographs:

"• The photograph identified as '3—VF's [Vincent Foster's] body looking down from top of berm' must be released, as the photograph is not so explicit as to overcome the public interest.

. . . .

"• The photograph entitled '5—VF's body—focusing on Rt. side of shoulder/arm' is again of such a nature as to be discoverable in that it is not focused in such a manner as to unnecessarily impact the privacy interests of the family.

. . . . .

"• The photograph entitled '1—Right hand showing gun & thumb in guard' is discoverable as it may be probative of the public's right to know.

. . . . .

"• The photograph entitled '4—VF's body focusing on right side and arm' is discoverable.

"• The photograph entitled '5—VF's body—focus on top of head thru heavy foliage' is discoverable." App. to Pet. for Cert. 45a.

On the second appeal to the same panel, the majority, again over Judge Pregerson's dissent, affirmed in part. 37 Fed. Appx. 863 (2002). Without providing any explanation, it upheld the release of all the pictures, "except that photo 3—VF's body looking down from top of berm is to be withheld." *Id.*, at 864.

We granted OIC's petition for a writ of certiorari to resolve a conflict in the Courts of Appeals over the proper interpretation of Exemption 7(C). 538 U. S. 1012 (2003). The only documents at issue in this case are the four photographs the Court of Appeals ordered released in its 2002 unpublished opinion. We reverse.

The OIC terminated its operations on March 23, 2004, see 28 U. S. C. § 596(b)(2), and transferred all records—including the photographs that are the subject of Favish's FOIA request—to the National Archives and Records Administration, see § 594(k)(1). The National Archives and Records Administration has been substituted as petitioner in the caption of this case. As all the actions relevant to our disposition of the case took place before March 23, 2004, we continue to refer to petitioner as OIC in this opinion.

## II

It is common ground among the parties that the death-scene photographs in OIC's possession are records or information "compiled for law enforcement purposes" as that phrase is used in Exemption 7(C). App. 87. This leads to the question whether disclosure of the four photographs "could reasonably be expected to constitute an unwarranted invasion of personal privacy."

Favish contends the family has no personal privacy interest covered by Exemption 7(C). His argument rests on the proposition that the information is only about the decedent, not his family. FOIA's right to personal privacy, in his view, means only "the right to control information about oneself." Brief for Respondent Favish 4. He quotes from our decision in *Reporters Committee*, where, in holding that a person has a privacy interest sufficient to prevent disclosure of his own rap sheet, we said "the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person." 489 U. S., at 763. This means, Favish says, that the individual who is the subject of the information is the only one with a privacy interest.

We disagree. The right to personal privacy is not confined, as Favish argues, to the "right to control information about oneself.". Brief for Respondent Favish 4. Favish misreads the quoted sentence in *Reporters Committee* and adopts too narrow an interpretation of the case's holding. To say that the concept of personal privacy must "encompass" the individual's control of information about himself does not mean it cannot encompass other personal privacy interests as well. *Reporters Committee* had no occasion to consider whether individuals whose personal data are not contained in the requested materials also have a recognized privacy interest under Exemption 7(C).

*Reporters Committee* explained, however, that the concept of personal privacy under Exemption 7(C) is not some limited or "cramped notion" of that idea. 489 U. S., at 763. Records or information are not to be released under FOIA if disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U. S. C. § 552(b)(7). This provision is in marked contrast to the language in Exemption 6, pertaining to "personnel and medical files," where withholding is required only if disclosure "would constitute a clearly unwarranted invasion of personal privacy." § 552(b)(6). The adverb "clearly," found in Ex-

emption 6, is not used in Exemption 7(C). In addition, "whereas Exemption 6 refers to disclosures that 'would constitute' an invasion of privacy, Exemption 7(C) encompasses any disclosure that 'could reasonably be expected to constitute' such an invasion." *Reporters Committee,* 489 U. S., at 756. Exemption 7(C)'s comparative breadth is no mere accident in drafting. We know Congress gave special consideration to the language in Exemption 7(C) because it was the result of specific amendments to an existing statute. See *id.,* at 756, n. 9, 777, n. 22.

Law enforcement documents obtained by Government investigators often contain information about persons interviewed as witnesses or initial suspects but whose link to the official inquiry may be the result of mere happenstance. There is special reason, therefore, to give protection to this intimate personal data, to which the public does not have a general right of access in the ordinary course. *Id.,* at 773. In this class of cases where the subject of the documents "is a private citizen," "the privacy interest . . . is at its apex." *Id.,* at 780.

Certain *amici* in support of Favish rely on the modifier "personal" before the word "privacy" to bolster their view that the family has no privacy interest in the pictures of the decedent. This, too, misapprehends the family's position and the scope of protection the exemption provides. The family does not invoke Exemption 7(C) on behalf of Vincent Foster in its capacity as his next friend for fear that the pictures may reveal private information about Foster to the detriment of his own posthumous reputation or some other interest personal to him. If that were the case, a different set of considerations would control. Foster's relatives instead invoke their own right and interest to personal privacy. They seek to be shielded by the exemption to secure their own refuge from a sensation-seeking culture for their own peace of mind and tranquility, not for the sake of the deceased.

In a sworn declaration filed with the District Court, Foster's sister, Sheila Foster Anthony, stated that the family had been harassed by, and deluged with requests from, "[p]olitical and commercial opportunists" who sought to profit from Foster's suicide. App. 94. In particular, she was "horrified and devastated by [a] photograph [already] leaked to the press." *Ibid.* "[E]very time I see it," Sheila Foster Anthony wrote, "I have nightmares and heart-pounding insomnia as I visualize how he must have spent his last few minutes and seconds of his life." *Ibid.* She opposed the disclosure of the disputed pictures because "I fear that the release of [additional] photographs certainly would set off another round of intense scrutiny by the media. Undoubtedly, the photographs would be placed on the Internet for world consumption. Once again my family would be the focus of conceivably unsavory and distasteful media coverage." *Id.*, at 95. "[R]eleasing any photographs," Sheila Foster Anthony continued, "would constitute a painful unwarranted invasion of my privacy, my mother's privacy, my sister's privacy, and the privacy of Lisa Foster Moody (Vince's widow), her three children, and other members of the Foster family." *Id.*, at 93.

As we shall explain below, we think it proper to conclude from Congress' use of the term "personal privacy" that it intended to permit family members to assert their own privacy rights against public intrusions long deemed impermissible under the common law and in our cultural traditions. This does not mean that the family is in the same position as the individual who is the subject of the disclosure. We have little difficulty, however, in finding in our case law and traditions the right of family members to direct and control disposition of the body of the deceased and to limit attempts to exploit pictures of the deceased family member's remains for public purposes.

Burial rites or their counterparts have been respected in almost all civilizations from time immemorial. See gener-

ally 26 Encyclopaedia Britannica 851 (15th ed. 1985) (noting that "[t]he ritual burial of the dead" has been practiced "from the very dawn of human culture and . . . in most parts of the world"); 5 Encyclopedia of Religion 450 (1987) ("[F]uneral rites . . . are the conscious cultural forms of one of our most ancient, universal, and unconscious impulses"). They are a sign of the respect a society shows for the deceased and for the surviving family members. The power of Sophocles' story in Antigone maintains its hold to this day because of the universal acceptance of the heroine's right to insist on respect for the body of her brother. See Antigone of Sophocles, 8 Harvard Classics: Nine Greek Dramas 255 (C. Eliot ed. 1909). The outrage at seeing the bodies of American soldiers mutilated and dragged through the streets is but a modern instance of the same understanding of the interests decent people have for those whom they have lost. Family members have a personal stake in honoring and mourning their dead and objecting to unwarranted public exploitation that, by intruding upon their own grief, tends to degrade the rites and respect they seek to accord to the deceased person who was once their own.

In addition this well-established cultural tradition acknowledging a family's control over the body and death images of the deceased has long been recognized at common law. Indeed, this right to privacy has much deeper roots in the common law than the rap sheets held to be protected from disclosure in *Reporters Committee.* An early decision by the New York Court of Appeals is typical:

> "It is the right of privacy of the living which it is sought to enforce here. That right may in some cases be itself violated by improperly interfering with the character or memory of a deceased relative, but it is the right of the living, and not that of the dead, which is recognized. A privilege may be given the surviving relatives of a deceased person to protect his memory, but the privilege exists for the benefit of the living, to protect their feel-

ings, and to prevent a violation of their own rights in the character and memory of the deceased." *Schuyler* v. *Curtis*, 147 N. Y. 434, 447, 42 N. E. 22, 25 (1895).

See also *Reid* v. *Pierce County*, 136 Wash. 2d 195, 212, 961 P. 2d 333, 342 (1998) ("[T]he immediate relatives of a decedent have a protectable privacy interest in the autopsy records of the decedent"); *McCambridge* v. *Little Rock*, 298 Ark. 219, 231–232, 766 S. W. 2d 909, 915 (1989) (recognizing the privacy interest of the murder victim's mother in crime scene photographs); *Bazemore* v. *Savannah Hospital*, 171 Ga. 257, 155 S. E. 194 (1930) *(per curiam)* (recognizing parents' right of privacy in photographs of their deceased child's body); Restatement (Second) of Torts § 652D, p. 387 (1977) (recognizing that publication of a photograph of a deceased infant—a hypothetical "child with two heads"—over the objection of the mother would result in an "inva[sion]" of the mother's "privacy").

We can assume Congress legislated against this background of law, scholarship, and history when it enacted FOIA and when it amended Exemption 7(C) to extend its terms. Those enactments were also against the background of the Attorney General's consistent interpretation of the exemption to protect "members of the family of the person to whom the information pertains," U. S. Dept. of Justice, Attorney General's Memorandum on the Public Information Section of the Administrative Procedure Act 36 (June 1967), and to require consideration of the privacy of "relatives or descendants" and the "possible adverse effects [from disclosure] upon [the individual] or his family," U. S. Dept. of Justice Memorandum on the 1974 Amendments to the Freedom of Information Act 9–10 (Feb. 1975), reprinted in House Committee on Government Operations and Senate Committee on the Judiciary, Freedom of Information Act and Amendments of 1974 (Pub. L. 93–502), Source Book, App. 5, pp. 519–520, 94th Cong., 1st Sess. (Joint Comm. Print 1975).

We have observed that the statutory privacy right protected by Exemption 7(C) goes beyond the common law and the Constitution. See *Reporters Committee*, 489 U. S., at 762, n. 13 (contrasting the scope of the privacy protection under FOIA with the analogous protection under the common law and the Constitution); see also *Marzen* v. *Department of Health and Human Servs.*, 825 F. 2d 1148, 1152 (CA7 1987) ("[T]he privacy interest protected under FOIA extends beyond the common law"). It would be anomalous to hold in the instant case that the statute provides even less protection than does the common law.

The statutory scheme must be understood, moreover, in light of the consequences that would follow were we to adopt Favish's position. As a general rule, withholding information under FOIA cannot be predicated on the identity of the requester. See *Reporters Committee, supra*, at 771. We are advised by the Government that child molesters, rapists, murderers, and other violent criminals often make FOIA requests for autopsies, photographs, and records of their deceased victims. Our holding ensures that the privacy interests of surviving family members would allow the Government to deny these gruesome requests in appropriate cases. We find it inconceivable that Congress could have intended a definition of "personal privacy" so narrow that it would allow convicted felons to obtain these materials without limitations at the expense of surviving family members' personal privacy.

For these reasons, in agreement with the Courts of Appeals for both the District of Columbia and the Ninth Circuit, see *Accuracy in Media* v. *National Park Serv.*, 194 F. 3d 120 (CADC 1999); 217 F. 3d 1168 (CA9 2000), we hold that FOIA recognizes surviving family members' right to personal privacy with respect to their close relative's death-scene images. Our holding is consistent with the unanimous view of the Courts of Appeals and other lower courts that have addressed the question. See, *e. g.*, *New York Times Co.* v.

*National Aeronautics and Space Admin.*, 782 F. Supp. 628, 631, 632 (CADC 1991) (sustaining a privacy claim under the narrower Exemption 6 with respect to an audiotape of the Space Shuttle Challenger astronauts' last words, because "[e]xposure to the voice of a beloved family member immediately prior to that family member's death . . . would cause the Challenger families pain" and inflict "a disruption [to] their peace of mind every time a portion of the tape is played within their hearing"), on remand from 920 F. 2d 1002 (CADC 1990); *Katz* v. *National Archives and Records Admin.*, 862 F. Supp. 476, 485 (DC 1994) (exempting from FOIA disclosure autopsy X-rays and photographs of President Kennedy on the ground that their release would cause "additional anguish" to the surviving family), aff'd on other grounds, 68 F. 3d 1438 (CADC 1995); *Lesar* v. *Department of Justice*, 636 F. 2d 472, 487 (CADC 1980) (recognizing, with respect to the assassination of Dr. Martin Luther King, Jr., his survivors' privacy interests in avoiding "annoyance or harassment"). Neither the deceased's former status as a public official, nor the fact that other pictures had been made public, detracts from the weighty privacy interests involved.

## III

Our ruling that the personal privacy protected by Exemption 7(C) extends to family members who object to the disclosure of graphic details surrounding their relative's death does not end the case. Although this privacy interest is within the terms of the exemption, the statute directs nondisclosure only where the information "could reasonably be expected to constitute an unwarranted invasion" of the family's personal privacy. The term "unwarranted" requires us to balance the family's privacy interest against the public interest in disclosure. See *Reporters Committee*, 489 U. S., at 762.

FOIA is often explained as a means for citizens to know "'what their Government is up to.'" *Id.*, at 773. This

phrase should not be dismissed as a convenient formalism. It defines a structural necessity in a real democracy. The statement confirms that, as a general rule, when documents are within FOIA's disclosure provisions, citizens should not be required to explain why they seek the information. A person requesting the information needs no preconceived idea of the uses the data might serve. The information belongs to citizens to do with as they choose. Furthermore, as we have noted, the disclosure does not depend on the identity of the requester. As a general rule, if the information is subject to disclosure, it belongs to all.

When disclosure touches upon certain areas defined in the exemptions, however, the statute recognizes limitations that compete with the general interest in disclosure, and that, in appropriate cases, can overcome it. In the case of Exemption 7(C), the statute requires us to protect, in the proper degree, the personal privacy of citizens against the uncontrolled release of information compiled through the power of the State. The statutory direction that the information not be released if the invasion of personal privacy could reasonably be expected to be unwarranted requires the courts to balance the competing interests in privacy and disclosure. To effect this balance and to give practical meaning to the exemption, the usual rule that the citizen need not offer a reason for requesting the information must be inapplicable.

Where the privacy concerns addressed by Exemption 7(C) are present, the exemption requires the person requesting the information to establish a sufficient reason for the disclosure. First, the citizen must show that the public interest sought to be advanced is a significant one, an interest more specific than having the information for its own sake. Second, the citizen must show the information is likely to advance that interest. Otherwise, the invasion of privacy is unwarranted.

We do not in this single decision attempt to define the reasons that will suffice, or the necessary nexus between the

requested information and the asserted public interest that would be advanced by disclosure. On the other hand, there must be some stability with respect to both the specific category of personal privacy interests protected by the statute and the specific category of public interests that could outweigh the privacy claim. Otherwise, courts will be left to balance in an ad hoc manner with little or no real guidance. *Id.*, at 776. In the case of photographic images and other data pertaining to an individual who died under mysterious circumstances, the justification most likely to satisfy Exemption 7(C)'s public interest requirement is that the information is necessary to show the investigative agency or other responsible officials acted negligently or otherwise improperly in the performance of their duties.

The Court of Appeals was correct to rule that the family has a privacy interest protected by the statute and to recognize as significant the asserted public interest in uncovering deficiencies or misfeasance in the Government's investigations into Foster's death. It erred, however, in defining the showing Favish must make to substantiate his public interest claim. It stated that "[n]othing in the statutory command conditions [disclosure] on the requesting party showing that he has knowledge of misfeasance by the agency" and that "[n]othing in the statutory command shields an agency from disclosing its records because other agencies have engaged in similar investigations." 217 F. 3d, at 1172–1173. The court went on to hold that, because Favish has "tender[ed] evidence and argument which, if believed, would justify his doubts," the FOIA request "is in complete conformity with the statutory purpose that the public know what its government is up to." *Id.*, at 1173. This was insufficient. The Court of Appeals required no particular showing that any evidence points with credibility to some actual misfeasance or other impropriety. The court's holding leaves Exemption 7(C) with little force or content. By requiring courts to engage in a state of suspended disbelief

with regard to even the most incredible allegations, the panel transformed Exemption 7(C) into nothing more than a rule of pleading. The invasion of privacy under its rationale would be extensive. It must be remembered that once there is disclosure, the information belongs to the general public. There is no mechanism under FOIA for a protective order allowing only the requester to see whether the information bears out his theory, or for proscribing its general dissemination.

We hold that, where there is a privacy interest protected by Exemption 7(C) and the public interest being asserted is to show that responsible officials acted negligently or otherwise improperly in the performance of their duties, the requester must establish more than a bare suspicion in order to obtain disclosure. Rather, the requester must produce evidence that would warrant a belief by a reasonable person that the alleged Government impropriety might have occurred. In *Department of State* v. *Ray*, 502 U. S. 164 (1991), we held there is a presumption of legitimacy accorded to the Government's official conduct. *Id.*, at 178–179. The presumption perhaps is less a rule of evidence than a general working principle. However the rule is characterized, where the presumption is applicable, clear evidence is usually required to displace it. Cf. *United States* v. *Armstrong*, 517 U. S. 456, 464 (1996) (" '[I]n the absence of clear evidence to the contrary, courts presume that [Government agents] have properly discharged their official duties' "); *United States* v. *Chemical Foundation, Inc.*, 272 U. S. 1, 14–15 (1926) ("The presumption of regularity supports the official acts of public officers and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties"). Given FOIA's prodisclosure purpose, however, the less stringent standard we adopt today is more faithful to the statutory scheme. Only when the FOIA requester has produced evidence sufficient to satisfy this standard will there exist a counterweight on the FOIA scale

for the court to balance against the cognizable privacy interests in the requested records. Allegations of government misconduct are "'easy to allege and hard to disprove,'" *Crawford-El* v. *Britton,* 523 U. S. 574, 585 (1998), so courts must insist on a meaningful evidentiary showing. It would be quite extraordinary to say we must ignore the fact that five different inquiries into the Foster matter reached the same conclusion. As we have noted, the balancing exercise in some other case might require us to make a somewhat more precise determination regarding the significance of the public interest and the historical importance of the events in question. We might need to consider the nexus required between the requested documents and the purported public interest served by disclosure. We need not do so here, however. Favish has not produced any evidence that would warrant a belief by a reasonable person that the alleged Government impropriety might have occurred to put the balance into play.

The Court of Appeals erred in its interpretation of Exemption 7(C). The District Court's first order in March 1998—before its decision was set aside by the Court of Appeals and superseded by the District Court's own order on remand—followed the correct approach. The judgment of the Court of Appeals is reversed, and the case is remanded with instructions to grant OIC's motion for summary judgment with respect to the four photographs in dispute.

*It is so ordered.*